The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit, are admonished to draw nigh and give their attention, for the Court is now sitting. That save the United States and this Honorable Court. You may be seated. Mr. Lawrence, when you're ready. May it please the Court, and good morning, Chief Judge Gregory, Judge King, Judge Quadobam. I stand before you not just representing Christine and Patrick Baehr, the class representatives, but this is a certified class action, so I'm standing before you here today representing 1,088 persons that are members of this class. And I'd like to begin my remarks by highlighting three points that I want to cover that are overarching themes, and that is, first, with regards to the Article III standing issue, bribery is a form, I'm sorry, kickbacks are merely a form of bribery, which inherently harm consumers. No court has held that a consumer is not harmed as a result of a kickback or a bribe, and this court shouldn't be the first to so hold. Secondly, Judge Bennett wrongly applied monomany with regards to the statute of limitations analysis, just like he did in Edmondson, and this court reversed him on that issue, and you should do similar here. The cases followed one-two right after each other before he could receive this court's guidance with regards to that issue. And nothing, nothing placed any of these 1,088 persons on inquiry notice, and certainly there's no evidence in the record that any of these class members actually made any inquiry regarding the relationship between Lakeview and the Northups. We think that's powerful evidence. And finally, with regards to the motion to compel regarding the waiver attorney-client issue. That's uniquely important in this case because it goes to an act of concealment. Mr. Northup told his supervisor that his attorney said that no disclosure to these consumers needed to be made, and in fact, none ever was. And we believe that that is important based on this court's jurisprudence that finds that there's going to be a waiver of that same subject matter with that attorney, but even, and this court has never adopted the fairness doctrine. But if you did adopt the fairness doctrine in this case, you should find that in fact, my clients would be prejudiced as a result of this because there's no way to untangle that advice and that communication that Mr. Northup gave, communicated to his supervisor, who was a third party, not subject to the attorney-client privilege. And that occurred, really, we believe that if you let us behind the veil there of the attorney-client privilege that he voluntarily disclosed to a third party, you're going to find, we're going to find, that he either didn't receive that advice or he provided false and misleading information to his attorney regarding that. Because we think that if he disclosed the reality of this relationship, the reality of the kickbacks in this case that were closely tracked by secret records that they were keeping between them, that no lawyer with their salt would have ever given advice that that would need to be disclosed, let alone whether that could even be done. So moving now to the Article 3 issue. We think that Spokio, and I think courts are finding that Spokio, was no radical change in the law for establishing Article 3 standing. It's a case of controversy, and you have to have injury in fact, which the court just clarified, must be concrete and particularized harm. Now, every court that's considered this issue so far has determined that a denial of impartial and fair competition among settlement service providers satisfies the Article 3 standing requirement. Now, it wasn't applying Spokio, right? So it wasn't post-Spokio, but the Third Circuit, as we cited, the Sixth Circuit, and implicitly we believe the Fourth Circuit in Bullwark has said that there is Article 3 standing for these respite kickback cases based upon the denial of impartial and fair competition among settlement service providers. How do you distinguish our Dreher case? Dreher. I'm sorry, Your Honor. We have a Dreher case that Judge Steiker authored in 2017 that was a Fair Credit Reporting Act case where there was a violation of the statute, but it talked about the requirement that there be some real-world effect, some actual consequence to the plaintiff aside from the violation. And in light of your client's testimony that he was not aware of any overcharge and was not even aware of any dissatisfaction, what's the real-world effect of the violation you allege to have occurred? Thank you, Your Honor. I think that's a good question. And this is not a mere Credit Reporting Act situation. This is undisclosed compensation in the form of a kickback received by someone in violation of the law. And so in that case, that kickback is unlawfully obtained by your, in this case, we have the fiduciary. So the real-world impact is that there's harm because the consumer should be receiving the service at a lower price. Now, there's a question about whether it's market rate or not, whether these plaintiffs could have received a better price from another service provider. We think that there is that evidence here because the Northrop team could have went out and shopped to other settlement service providers or even negotiated with Lakeview that instead of taking money themselves, they would have reduced the cost to our clients. And these are no small infractions as in the Fair Credit Reporting Act situation where it can be, where there's some little minuscule report there that isn't really going to negatively impact you. Here the evidence is that the Northrops pocketed about $1,500 for this transaction just for one client. Over $600,000 they pocketed from our clients over the course of four or five years. So the real-world impact is hard cash, big money. How come you didn't allege that when your client was asked about it, he said he's not aware of any of that? That's why I'm having trouble swearing that you're saying there's a hard cash impact when your client certainly wasn't aware of it. And what he said was that the price he paid was the same amount he paid eight years earlier for a house that was much less in cost. I get the difference in perhaps the statutes. The allegations here sound more serious than perhaps a technical violation reporting act. But still, I don't think that changes the Article III analysis, does it? I think it does, and here's why. When my client said he was satisfied, he was talking about when he received the service, was he satisfied? And he said yes. And he said when he received the service, did he believe that he had gotten a fair price? He said yes. But he turned around and sued on behalf of the class when he found out that the amount that he paid really wasn't the amount for the service. It was half that, and the other half was pocketed by his fiduciary. So there's a distinction between Mr. Bair while he's receiving the service and Mr. Bair when he learns that there's an illegal kickback being paid to his fiduciary, the real estate agent. So clearly he expressed dissatisfaction by the fact that he filed the lawsuit. And during the testimony, we actually went back and said, okay, well, you said you were satisfied. Why are you unsatisfied? Well, I have a bad faith fiduciary who's pocketing money. And they say, well, you can't do that. You can't go and clean up a client's testimony. Well, the client was confused. This is a regular consumer being honest and answering the question, and he interpreted the question, we believe the facts show. He interpreted the question of when he received the service, and at the time before it, was he satisfied? And the answer is yes, because if the answer is no, then we're going to lose for another reason. Right? And that's statute of limitations, because he doesn't file this until four years later. And he files it four years later because he's outraged when he learns of the money being pocketed. This is not a mere technical infraction. Right? This is not a statutory right that's provided by Congress that someone's trying to have a tiki-tac case over. We're dealing with rank corruption, hidden, secret books and records. Right? Things that are being, you know, hidden from these people. And we have fiduciaries involved. We think that's material, and that's particular to our case. It's interesting because I started off with fair and impartial. Right? But in our case, fair and impartial being Article 3, satisfying Article 3. But in our case, we also have the added element of a fiduciary. And the added element of a fiduciary means that the Northrop team had an obligation to act in the best interest of these clients. And that requires a fiduciary like myself to disclose all my compensation. I can't earn undisclosed compensation from experts that I might retain in a case and not tell my client about it. I have to tell them about all the compensation I'm receiving, and the client has to agree with it. Can I ask you a question about the equitable tolling issue? Yes. And I understand the point about the incorrect test, and I think you make a compelling argument on the absence of anything to provide inquiry notice. But on the requirement that there be an affirmative act under the fraudulent concealment aspect of that test, I think I understand what you are going to say the affirmative act is. It's the creation of the agreement stuff. But does the fact that your client was not aware of the marketing agreement or was not aware of the spreadsheets that you say support evidence, is that important or relevant in whether or not there is an affirmative act for purposes of equitable tolling? No. That's not important for that element. It's important, though, for inquiry analysis, because if he was aware by 1,088 clients were aware, then they might have notice inquiry. They're aware, certainly, of the spreadsheets. But let me be directly addressed to your Honor in asking. And that is that you do not have to have reliance on the fraudulent active concealment. My client doesn't have to be aware of whatever artifice and device you're using to conceal it. Because what was going on here, why did they enter into the marketing agreement? Why did they have the sham employment agreement before that? And why did they tell no one about the secret spreadsheets? And that's because they had to deal with regulators and people around them that if they just had bags of cash showing up from Lakeview, that would be a problem. They have to have an excuse on their own books and records and to deal with their regulators and to deal with anybody that might get a view of what's going on with payments flowing from them, banks, right, anything. They have to engage in some affirmative active concealment because if they do what's just reality here and they say, here's payment for referrals, then that's just admitting right away. What's the authority that they don't have to rely on the alleged affirmative act? It's the opposite. There is no authority that they have to rely on. Okay, so there's not a case that says what you're saying. You're saying there's just not a case that says the contrary? Well, I would disagree, Your Honor. I would say there's a case that says you have to have affirmative acts of concealment. Yes, sir. And then there's no case that says that the plaintiff's relied upon. So you're saying that's an additional requirement. That would be an additional requirement that's not consistent with what the case law says. And in here, what I think is important, too, is that what Judge Bennett does, he focuses on any little bits of evidence that they may have been aware of the marketing agreement. Well, that's not the question as to whether they were aware of a business arrangement between them that was apparently legitimate, that would have been apparently legitimate. And the fact that they referred to them, that's not something that would put you on inquiry notice to go look for something. That's just notice that there may have been some legitimate business arrangement. You have to have inquiry notice based on red flags, not innocuous facts, and that's what the court did. And he accepted their arguments in that regard. But I talk, too, just to round out again so that I cover all the issues here, about the issue about fraudulent concealment, or not fraudulent concealment, about the disclosure of the attorney-client privilege. And that's important because one of the acts of concealment here also was the providing of an ABA disclosure, Affiliated Business Arrangement Disclosure. And that ABA disclosure says here's all the arrangements that we have with third parties. And that's because RESPA requires that for part of its safe harbor. So if you want to have relationships with people, you have to disclose it to consumers. But you're not saying that this relationship falls under the ABA definition? No, I'm not saying that. I'm not saying the real relationship, the substance of it, right, is an absolute fraud. It's a corrupt bribery scheme between the parties. But they're trying to say that they come within the safe harbor. And they're saying, and his supervisor told him, when we had the supposedly legitimate marketing agreement, right, with a supposedly legitimate marketing agreement, if it was in play, it would have had to be disclosed along with all the other marketing agreements that they said that they were disclosing. Why is that if it's not an ownership interest like the ABA definition? The ABA seems to require a franchise or ownership interest. It doesn't seem to require a general business relationship. I'm surprised. I agree, Your Honor. But it's because the disclosure itself represents the one that they handed to them, represents that they're disclosing all their marketing arrangements. I see that my time's out. I understand your point. Thank you. Thank you, Your Honor. Thank you, counsel. Mr. Varon. Thank you, Your Honors. May it please the Court, Jay Varon for the appellees. Your Honors, I think the problem here is that we have a robust summary judgment record below. And there are huge gaps between what plaintiffs claim and what their theories are and what the facts in the record actually show and what the legal support is. So the best thing to do, I think, is maybe start with standing. Your Honor has already noted that there's no economic harm of any kind, no tangible harm of any kind, no allegation in the complaint. You've discussed the fees were fair, the service was good, no complaints. The only allegation in the complaint is that there was a loss of impartial and fair competition among service providers. And that is both a legally deficient claim and a factually deficient claim. It's legally deficient because you can read RESPA from the beginning to the end and you will never see anything in it about competition. Well, they say they were overcharged. I mean, they said some other things, too, but there's evidence in the record, according to them, that they were overcharged. That's part of the problem. According to them, they say there's evidence in the record they were overcharged, but the testimony is that they weren't overcharged, that they paid fair fees, that the fees were less than they paid for a house eight years before, that the title insurance rate was regulated. Their claim here, Your Honor, is a claim that is not in the complaint, is not in the deposition testimony. It's in a self-made affidavit after the fact that says the title insurance premiums were split. And there's simply no evidence to support that. We have, first of all, at JA 706 to 707 is a list of all the payments that Lakeview made to the Northrop's. All the bank records were produced. All the Northrop records were produced. The only evidence is that the payments that were made from Lakeview to the Northrop team is on this list, and they were the monthly payments to be paid under the marketing agreement. $6,000 in the beginning, up to $9,000, a little bit of $12,000, mostly settled at $9,000. Those were the only payments. Mr. Lawrence has discovered that they continued to track commissions like they did before the marketing agreement. And he had a big deposition of Barbara Cohn, the bookkeeper, about what the commission sheet showed and what each column meant. And they may have tracked it, but there is absolutely no evidence that they paid it. And to be sure about it, after, you know, a four-hour deposition, the cross-examination to Ms. Cohn was, look, and this is all, Your Honor, in Exhibit C to our reply memo. It's in the joint appendix. Look at this particular commission that supposedly, was this ever paid? No. Was the only payments that were made under the marketing agreement, Exhibit 3? Yes. And finally, were any other payments other than the marketing fees paid to the Northrops? No. Were there any payments of any kind other than that made to the Northrop team? No. And so on a summary judgment record, he just can't stand up and say that the title insurance fees were split when the bank records don't show it, the bookkeeper denies it, and all you have is tracking. So there were no overcharges here. And we go back to the degree of impartial and fair competition. And the reason that that doesn't work, Your Honor, as I say, first of all, the statute doesn't mention it. Second of all, all the cases that talk about it are in the affiliated business arrangement context. And they also rely, all of them, on a 1982 House report. That's significant because the controlled business arrangement amendments were enacted in 1983. So all these cases cite a 1982 report that talks about a bill that was never enacted. And lo and behold, you know what that bill had in it? It had competitor rights of action. It had percentage limitations on how much any company could do in controlled business. Those provisions never made it into the controlled business amendments. So obviously relying on that kind of House report to say that RESPA is concerned with fair and impartial competition is suspect. But even if it was true, it only relates to affiliated business arrangements and not the rest. The other thing that's important for me to get to, Your Honor, is the notion of fiduciary duty. This, too, is a post hoc after deposition testimony claim. And it's relatively easy to dispel. If you look at JA 230, there's an exclusive right to represent buyer agreement that the Bears entered into with Long and Foster. The only people who are parties to this agreement are the Bears and their sales agent, Maya Dykstra, who represents Long and Foster, neither of which are defendants. Craig Northrup was not representing the Bears. He was representing the seller whose house the Bears were buying. The Northrup team is a professional corporation. It's not licensed as a broker or agent. It doesn't owe fiduciary duties. Lakeview had no fiduciary relationship. Lenegan, nothing with the Bears. Even if this agreement was capable of producing a fiduciary duty to the appellees, the scope of the broker duties in paragraph 3A, JA 230, is limited to representing the buyer in a diligent and effective manner to locate property available for purchase and suitable to the buyer. And that's exactly how the statute, 17-101-1 of the Business Professions and Occupation Code, describes real estate brokerage services. For consideration, assisting another person to locate or obtain for any residential real estate. And if there was any doubt about the scope, there's another paragraph in the brokerage agreement, paragraph 12, in which the buyer acknowledges that the broker is only retaining the person as a real estate agent, not as an attorney, tax advisor, structural engineer, a whole litany of topics, including the catch-all, other professionals as provider. And consistent with all this, Judge Quarles, when the same claim was made against Long and Foster in this case, that they owed a fiduciary duty to the buyer, said no, under Maryland law, real estate brokerage service doesn't include referring title services or entering into third-party marketing agreements, a decision that the plaintiffs have never appealed. So there was no fiduciary duty. There were no fees, kickbacks that were split. The evidence shows that the only payments made were these marketing fee payments. And there you're right, Your Honor, there is a factual question about whether the payments were commensurate with the marketing services. So let me move to statute of limitations, if I could. I think, first of all, Your Honor, the fact that Judge Bennett applied Menominee is in no way dispositive of this issue. When we moved for summary judgment, we did so in 2015, before Menominee was decided. And our opening motion was made on the Marlington three-prong test. In our reply memo after Menominee came out, we argued Menominee. Judge Bennett applied Menominee. Menominee is not so far from Marlington, as the court noted in a footnote in Edmondson. It's possible to consider, and Judge Bennett did consider, fraudulent concealment as a possible extraordinary circumstance. It's true he didn't pay a lot of attention to it because he was focused on inquiry notice. But the facts in the record will show, as Your Honor was suggesting, that there is no deceptive conduct. And Mr. Lawrence is incorrect when he says there's no cases that go to reliance. Pocahontas, Marlington talk about the deception having to deflect litigation. That is the kind of reliance interest that we have. And if the deception, which is supposedly the sham marketing agreement, and I'll get to that in a second, was never observed by the plaintiffs, it couldn't have prevented them from discovering the claim. The claim was it's a sham marketing agreement. So on that issue, I want to stop you there. You referred to the Pocahontas case. Is that your primary authority for the issue that the alleged fraudulent concealment must have been known or relied on in some way? At the moment, I think it's my primary. But I also think it's inherent in what fraudulent concealment is. Fraudulent concealment, as Edmondson said, is some deceptive action designed to hide the claim. If there is nothing that precludes the plaintiffs from discovering the claim, there is no fraudulent concealment. And there's no element. I think it's important to look at RESPA too, Your Honor. RESPA is a one-year statute of limitations, pretty short that Congress intentionally made. Not only is it a one-year statute, it's an occurrence statute. It's not a discovery rule. Congress contemplated that if you didn't bring a claim within one year of the closing, you were time-barred. Now, it's true that fraudulent concealment and equitable tolling apply to all statutes. But given that this is an occurrence statute and not a discovery statute, it only stands to reason that the deception has to have an effect. And there was no deception. There was no effect here. There also was no deception. Let me cover that quickly. The primary theory of deception was a sham marketing agreement. That's just a label that the plaintiff put on it. They allege that it's a sham, that there was no record of any services being provided, that the marketing fee was just a quid pro quo referral fee. And when Judge Quarles considered the motion to dismiss, he had to accept those allegations as true and did. But on a summary judgment record, the evidence is all to the contrary. Rather than having a sham agreement, at pages 11 to 12 of our opposition brief, we and all of which is detailed in the joint appendix, we go through at some length to discuss the services that were provided. There were joint advertising occurring. There was advertisements of Lakeview being put in listing packs. There was signage and brochures around the offices. The marketing agreement also had a provision that said, in addition to those kinds of services that were articulated in the marketing agreement, the parties could mutually agree and decide on anything else. And there's oodles of testimony from Linnegan and others that that's what they did. And among the spreadsheets, counsel, that were referred to earlier, I understand your argument that there's no evidence that those amounts in there are paid. But do those spreadsheets and the fact that the amounts paid under the agreement increased without a written agreement, do those two things create at least a genuine issue of material fact on whether or not it was a legitimate agreement or not? I think they do. I think the fact that the fees increased and the question of RESPA in marketing agreements and in fact in most programs, Your Honor, is whether the fees that somebody who refers business receives is commensurate with the value of the goods, facilities or services that they provide. So yes, we're not here saying that there is no factual question about whether there's a RESPA violation. We're here saying there is no factual question that title insurance premiums of $3,000, Mr. Lawrence said, was split. There is absolutely no evidence of that and the bookkeeper disclaimed it. So the point is yes, there may be a question of whether the $6,000 fee, the $9,000 fee, the $12,000 fee was justified, which also raises an obvious question of class certification that never was issued below, but those questions don't go to concealment. They just go to whether there's a garden variety RESPA violation and that's the point, Your Honor. In order to have fraudulent concealment, it's not just that you violated RESPA, it's that you concealed it, that you hid it and while there's this great sham theory out there, there is no evidence that this was a sham. Also, the Long and Foster Affiliated Business Disclosure is a Long and Foster Affiliated Business Disclosure. It disclosed the relationships that Long and Foster had with certain affiliated companies like its mortgage company, its title companies and it disclosed other business relationships. It disclosed the ones that Long and Foster had. Nothing on this form said that they were disclosing the relationships that all their agents or any agent or any team had and there simply was no relationship with Lakeview. And I would dare say, Your Honor, that when we get to inquiry notice, the fact that Lakeview wasn't even on the form, assuming the plaintiffs read it and registered that, that would only excite their interest if they were truly bothered by the lack of impartial and fair competition. The fact that they're told, and this is what the record says, out of the blue one day, they were told they would close at Lakeview. Not only were they told they would close there, but that the Northrop team does all its closings in Lakeview. And that Mr. Baer testified that he thought Maya Dykstra, the agent, was instructed to send all her closings to Lakeview. So you think that's inquiry notice? Certainly with respect to a claim of injury that says we're deprived of fair and impartial competition. I used to do product liability work and if I told a client I use expert ABC for all my cases, does that give a potential client indication that I have some kickback with them? No, but here... What's the difference here? The difference is the allegation. Or the way we were heard in this case, according to paragraph 23 of the complaint, is that we were deprived of impartial and fair competition. Yet we never sought to engage another provider. We never asked about another provider. We never looked at the rates of anybody else. When we were told that everybody goes to Lakeview, we didn't say, well, might there be another company that could provide lower rates or lower service? If you are the one that's saying we were deprived of impartial and fair competition when you're told in this context that this is what's happening, that's enough to arouse your instincts. And as far as the kickbacks go, the kickbacks didn't hurt them economically. That may be one of the reasons that they never discovered it. But as I said, Your Honor, RESP has a one-year statute of limitations. If there's no deception and they don't find out, the statute runs. I think that's my basic argument. I guess I'd close with this, Your Honor, on the statute of limitations. I think Planoff's real theory, as I'm alluding to, is that the defendant should have admitted that they were taking kickbacks from Lakeview. In fact, they allege in paragraph 21 of the complaint, defendants never disclosed that Northrop defendants were receiving kickbacks from the Lakeview defendants. But the cases, Pocahontas, others, say that mere silence doesn't lead to told. You're not supposed to admit your violations, especially here when they're contested. How could you admit them? You could disclose other things, the marketing agreement being the issue, but the Bears testified they wouldn't have even cared if the marketing agreement was known and they didn't know about it so it couldn't have deceived them. Pocahontas says to commit a claim of fraud. In Pocahontas, they actually asked questions of the defendant and the defendant lied. And Pocahontas still said that that's not enough. You don't have to admit the violation. There has to be something more than that. So together, Your Honor, there is no injury that reaches Article III. I admit this is a unique case. I mean, we have a summary judgment record that shows it. We have allegations that don't plead harmful, tangible harm of any kind, which is very unique and rare. But that's the record we're faced with, and I think especially because Spokio reversed the Edwards case from the Ninth Circuit, which was a respite case, just like this one, that claimed no injury. They didn't reverse it directly. They said that Edwards was abrogated by their decisions in Spokio and also the Gauss case. You need something more, and plaintiffs don't have it. And on the equitable tolling thing, there absolutely was no fraudulent concealment. We ask that the matter be affirmed. I have about 45 seconds left if anybody has questions. One last thing. Do you care to say anything about the attorney-client privilege issue? I've read your brief. Sure. Yes, Your Honor. I mean, I think we rely on the order of the magistrate judge and the court. Not only was the challenge very untimely 15 months after the fact, and yes, there were some stays in between, but there's no question that it was untimely. But more than that, it was one comment that said, in response to a question, no, my lawyer said, I don't have to do this. And I would just add, real quickly if I could, Your Honor, that that advice is right. Mr. Lawrence is suggesting that no lawyer worth his salt would say that. I'm a lawyer that's worth his salt, and I'm telling you there's no obligation to disclose relationships between referring parties that aren't in an affiliated business arrangement. And it's done every day without disclosure. You can look in RESPA. There's no requirement to disclose why you make a referral. There's no disclosure about having a referral be impartial. And the referrals sometimes are and sometimes aren't. So I hope that responds to Your Honor's question. And I think that's all I have. Thank you, counsel. Thank you. Mr. Lawrence, you have some time reserved. In just touching upon what Mr. Barron said regarding the attorney-client issue, we're not trying to be ticky-tack, but he did not brief any of that in his briefing. And there's Fourth Circuit law on that, that if you do not submit a brief on an issue, you're deemed to have waived your arguments. We think our case is strong in this regard in any event, but we point that out to the court and we point that out in our brief. Going to the more weighty issue of Article 3, he is effectively arguing the facts constantly. And he's a great advocate, but this is not a trial court. And we have spreadsheets every month being sent to Mr. and Mrs. Northup's home address to avoid detection being sent to their home address by Lakeview so that they can check off whether they're receiving their appropriate commissions. And we have emails back and forth during this time frame of this market agreement where they're negotiating over whether the spreadsheets are complete and accurate. And they say words, literally words like, the amount due, the balance due. And this is supposed to be a market agreement that has a fixed payment of $6,000. And what the spreadsheets clearly show is that they're paying the $6,000 and keeping a balance, and then they increase the payments to $9,000 to start burning off the balance. And then they go to $12,000. And then they go to $9,000. They go to $6,000. They go to $9,000. They go to $12,000. And this happens all throughout. And why is that happening? Well, the only documentary evidence that this is happening is that they're negotiating the kickbacks. They're tracking each referral they're making, and they're putting down all these people, including my client. We have, if you look at the record, and this is in the joint appendix, 794 through 97 deals specifically with our client. What we did there was is we put together the HUD-1 statement for our client's closing. And then we attached a spreadsheet for that July month that was sent by Lakeview to the Northrop's, to their home address. And on there you'll see a line item that has the number of their, the date and the number, the case file number for their closing, the amount of their full title fee, and 50% commission to the Northrop team. Now, what Mr. Varon is constantly saying is, yes, there's evidence that we're tracking kickbacks, but there's no evidence that we're not paying. Well, that strains credulity because there's a fixed payment of $6,000 that goes to 9 to 12. Why are you paying double what you're supposedly getting for marketing? And the answer is because you're trying to burn off the balance that you owe for the kickbacks. Is there any witness who said that? Actually, Barbara Cohn said that. What was the JA site where she said that? I'll get that for you. It's in our brief. We actually quote her in our brief. It's what you said in the brief. Right, right. It's what we said in our brief. And this is what Mr. Varon was complaining about was that we went over it ad nauseum and said, why are you tracking these? Why are you tracking these? And she said, she's the bookkeeper, she said, because I'm being asked to track them. And I'm saying, and I ask her, why are you negotiating with them over a balance due? She goes, because we're tracking the commission's due. And what she said with good discipline, Your Honor, she said, but the payments were being made under the marketing agreement. But the payments were being made under the marketing agreement, right? Well, how were the payment, how were the amount balance due under these secret spreadsheets being decreased? They're being decreased, and you can see that, by the $6,000 payment under the marketing agreement. Right? The marketing, these spreadsheets, Your Honor, they're from 7-12 to 97, right? These spreadsheets show the $6,000 payment coming in for the marketing agreement as decreasing the balance for the kickbacks. That's our evidence that the payment for the kickbacks. I mean, it really, when we received these spreadsheets, it was an incredible moment. Because you don't find people tracking things in this way, in such a diligent manner. We can track per client, when their transaction closed, and we go right to the spreadsheet, and there it is, and there's the 50% going to the Northrop team. We think that it's undisputed, or it's really not disputable, right? The documents say what they say. The witnesses deny it, and they say, we were tracking them. Why were you tracking them? To see how effective we were in the marketing agreement. That's an answer. Doesn't make any sense. Right? What about if it was tracking them based on volume was the basis of the compensation for the marketing agreement? Volume. And therefore, volume meaning closings that you did the title work for. And so an individual closing would fit into the larger scheme of volume. Do you think that makes your case? Right. I understand your question, Your Honor. I don't think it hurts my case, because if that's their position, which isn't really their position, their position was they were tracking effectiveness. If they were just tracking volume, those spreadsheets wouldn't be worth what I believe that they're worth. Right? They wouldn't be the smoking gun that I stand up here before you and proclaim. But that's the question, whether or not, in fact, it is a smoking gun. I'm just saying, suppose it is based upon volume, and volume would depend upon how many closings they did the title work for, and, therefore, you still make track transactions. But you wouldn't track. But go ahead. But you wouldn't. And I'm sorry, Your Honor. No, go ahead. Go ahead. It's a great point. But you wouldn't track commissions, which is just a euphemism for the kickback. You mean you wouldn't call them commissions? You wouldn't track them. You have 50%. What would it matter? Why don't you apply 30%? Why don't you apply 100% to Northrop team? It doesn't make any sense. So you have the volume, and I want to be very precise. Right. In the case of the Bears, take a microcosm of this, you have approximately $300,000 listed. That would be the volume that you're speaking about. Right. Right? And that would be rational to track because you want to see how effective this is. The next column over, or somewhere over, is 50% commission to the Northrop team, calculated at $1,500. The next column over is you add up all those clients, and you come up with a number of a balanced due. And then that's the monthly. Then there's the yearly sheet that's kept monthly as well, too, where that number goes on the sheet, right, that's owed to the Northrops, and it's tracked as a drawdown for every $6,000, $9,000, or $12,000 payment you're using under the market agreement. I mean, it tracks perfectly. The accounting works. They were increasing the payments only upon the increase, the kickbacks that they were owed pursuant to the solicit agreement. Now, before the market agreement, it was just a straight-up no-show job for Mrs. Northrop. She was a supposed employee there with no office, no phone, no email, and she was paid up to $150,000, $175,000 a year, and that was just a straight payment. She would receive, they would just receive the entire amount. There was no attempt to try to show that this. It's not part of your class time period. No, but I think it's relevant, Your Honor, because the testimony is very clearly that the market agreement replaced the job. They admit to that. They admit that the market agreement replaced the job. So I think the evidence is going to come in as a common scheme and plan. Now, Mr. Barron said something that it sounds nuanced at first, and I actually had a hard time following it for a while because this isn't my space with affiliated business arrangements. I don't draft affiliated business arrangements. I litigate. And what his position was very clearly at the district court, and not as clearly today but very close, was that impartiality and fairness and competition is sufficient if you're dealing with an AA case that deals with an ABA. Now, why would that matter? Because if you're having illegal kickbacks, particularly on this frame, right, if you put together a structure to try to make it legitimate and you fail, and you fail to fall within the safe harbor, why is that a situation where you would have Article III standing because you're injured, but in a case where somebody didn't even go through the bother of setting up an ABA, which is what this case is, somebody didn't go through the bother of doing it, they're all of a sudden not denied that same right of impartial and fair competition. They're not injured like someone who had been duped into it by an ABA. It doesn't make any sense, and I think it really flips logic on its head. With regards to the fiduciary, let me be clear. Myra Dykstra, I'm sorry, I'm over my time. You are, but I'll let you have one more point, and that's it. Thank you, Myra. I very much appreciate it. Myra Dykstra worked for the Craig Northrup team. Craig Northrup was the head, obviously, of it. He split commissions with every one of his agents whenever they received it, so he absolutely was a fiduciary of my clients, the buyers in this situation, as was the Northrup team itself. Thank you, Honors. Thank you, Counselor. We'll come down to recounsel and proceed to our next case.
judges: Roger L. Gregory, Robert B. King, A. Marvin Quattlebaum Jr.